UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BECKER,<br><br>    Plaintiff,<br><br>v.<br><br>WARDEN SHERMAN, et al.,<br><br>    Defendants. | **CASE No. 1:16-cv-0828 AWI MJS (PC)**<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**(ECF NO. 39)**<br><br>**FOURTEEN-DAY DEADLINE** |

Plaintiff is a state prisoner proceeding with appointed counsel in a civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's Eighth Amendment failure to protect claim against Defendants L. Cartagena, K. Loyd, Maximo Lunes, Joel Martinez, C. Moreno, N. Peterson, M. Ross, Sherman, and J. Wetenkamp. Pending before the Court is Defendants Wetenkamp, Cartagena, Peterson, Loyd, Charkow-Ross[1], Sherman and Martinez (the "Moving Defendants") motion to dismiss the

---

[1] Defendant Charkow-Ross appears to be the same Defendant identified by Plaintiff as "M. Ross."

First Amended Complaint.[2] Plaintiff opposes the motion. This matter is fully briefed and ready for disposition.

**I.        Relevant Allegations[3]**

Plaintiff is a transgender inmate currently housed at Sierra Conservation Center ("SCC") in Jamestown, California. Immediately prior to her transfer to SCC, Plaintiff was housed at California Substance Abuse Treatment Facility ("CSATF") in Corcoran, California.

Plaintiff alleges in the First Amended Complaint that she has been assaulted, including sexually, multiple times while incarcerated in the California Department of Corrections and Rehabilitations ("CDCR") due to her status as a transgender inmate. These instances, which occurred at a variety of institutions, are documented in Plaintiff's Central File. Plaintiff alleges that the typical response to these incidents has been to transfer her to another institution.

On June 7, 2016, and June 29, 2016, Plaintiff was sexually assaulted at CSATF by different cell-mates. As a result, Defendant CSATF Warden Sherman arranged for Plaintiff to be transferred to SCC with the approval of Defendant SCC Warden Martinez.

On July 7, 2016, the Institution Classification Committee ("ICC") at CSATF reviewed Plaintiff's files to recommend a housing status upon transfer. The ICC was comprised of Defendants Cartagena, Charkow-Ross, and Peterson. Despite knowledge of Plaintiff's history of assault, including those that occurred when Plaintiff was previously housed at SCC, and her heightened risk for assault as a transgender inmate, the ICC simply transferred Plaintiff with a temporary single-cell housing assignment instead of providing her a permanent safe housing classification. This determination was based solely on the pending investigation into the June 29, 2016, incident. Plaintiff claims the

---

[2] Defendants Lunes and Moreno do not join in the motion to dismiss and have instead filed an Answer. (ECF No. 38.)
[3] Only those allegations that are relevant to the moving Defendants' motion are included here.

2

ICC relied only on the results of this investigation and ignored the totality of the evidence showing Plaintiff's inherent risk as a transgender inmate.

Following Plaintiff's transfer to SCC on July 14, 2016, Plaintiff was housed in a single cell pursuant to the CSATF ICC decision. In November 2016, an SCC classification committee, called the "Unit Classification Committee" (the "UCC"), was convened to review Plaintiff's housing assignment. This committee was comprised of Defendants Wetenkamp and Loyd. Despite knowledge of the history of assaults against Plaintiff and her heightened risk as a transgender inmate, the UCC endorsed Plaintiff's temporary single-cell status.

Plaintiff contends the CSATF ICC and the SCC UCC should have considered the totality of the evidence, including the history of assaults and her heightened risk for future harm as a transgender inmate, and assigned her to permanent single-cell status. She contends that in light of her multiple transfers to other institutions, she remains at risk of her housing status being revoked at any time, putting her in imminent danger of harm.

Warden Sherman is the only Moving Defendant sued in his individual capacity. All other Moving Defendants—Warden Martinez, Cartagena, Charkow-Ross, Peterson, Wetenkamp, and Loyd—are sued in their official capacities only. Plaintiff seeks damages and injunctive relief.

## II.     Legal Standards

### A.     Motion to Dismiss under Rule 12(b)(1)

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) motion tests whether a complaint alleges grounds for federal subject matter jurisdiction. A motion to dismiss for lack of subject matter jurisdiction will be granted if the complaint on its face fails to allege facts sufficient to establish subject matter jurisdiction. See Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In considering a Rule 12(b)(1) motion, the Court 'is not restricted to the face of the pleadings, but may

3

review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction.' McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988). Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the court's jurisdiction. See Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1122 (9th Cir. 2010).

### B. Motion to Dismiss under Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for motions to dismiss for "failure to state a claim upon which relief can be granted." In considering a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true the allegations of the complaint in question, Erickson v. Pardus, 551 U.S. 89 (2007), and construe the pleading in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969); Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir. 1999). Still, to survive dismissal for failure to state a claim, a pro se complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57 (2007). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Furthermore, a claim upon which the court can grant relief must have facial plausibility. Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In general, pro se pleadings are held to a less stringent standard than those drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520 (1972). The court has an obligation to construe such pleadings liberally. Bretz v. Kelman, 773 F.2d 1026, 1027 n.1 (9th Cir.

1985) (en banc). However, the court's liberal interpretation of a pro se complaint may not supply essential elements of the claim that were not pled. <u>Ivey v. Board of Regents of Univ. of Alaska</u>, 673 F.2d 266, 268 (9th Cir. 1982). In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." <u>Outdoor Media Group, Inc. v. City of Beaumont</u>, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).

## III.  Discussion

Moving Defendants raise two grounds for dismissal. First, they argue that the Court lacks subject matter jurisdiction because Plaintiff has not alleged any injury or any real or immediate threat of injury and therefore fails to establish standing. Second, the Moving Defendants assert that Plaintiff fails to adequately state an Eighth Amendment failure to protect claim against any of them.

### A.  Subject Matter Jurisdiction

In the Moving Defendants' first ground for dismissal, they argue that Plaintiff's allegation of future potential harm if her temporary single-cell status is revoked is too speculative to confer subject matter jurisdiction. They further contend that revocation is not a certainty or, if it does occur, that there is no indication that Plaintiff would be placed into a cell with a dangerous inmate likely to sexually assault her. Lastly, they argue that there is no indication that any future housing decisions will be made by any of the named Defendants.

Plaintiff counters that she has already suffered numerous assaults while incarcerated and that awaiting another assault would not prevent the assault. Per Plaintiff, in light of the frequency with which she has been transferred and her housing classification changed, the Moving Defendants' grant of a temporary (as opposed to permanent) single cell designation means that Plaintiff continues to be at risk of being double-celled and placed in danger again. She contends that future assaults are not

speculative but instead, given the frequency with which they have occurred over the years at multiple institutions, practically inevitable if she is not in a single cell status.

To have standing for injunctive relief under § 1983, a plaintiff must allege that she is likely to suffer future injury from the alleged misconduct by the defendants. See City of L.A. v. Lyons, 461 U.S. 95, 105, 110 (1983). The reasonableness of a plaintiff's apprehension is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. Id. at 107 n.8.

To support their argument that Plaintiff's allegation of future harm is speculative, Moving Defendants cite the Court to three cases: O'Shea v. Littleton, 414 U.S. 488 (1974); Rizzo v. Goode, 423 U.S. 362 (1976); and Ashcroft v. Mattis, 431 U.S. 171 (1977) (per curiam).

In O'Shea v. Littleton, 19 individuals brought a class action on behalf of the citizens of Cairo, Illinois, alleging that the Defendants (state and county judicial officials) intentionally engaged in continuing patterns and practices in the administration of the criminal justice system that deprive the plaintiffs of various constitutional rights. 414 U.S. at 490-92. In ultimately finding that the plaintiffs did not have standing to bring suit under Article III of the Constitution, the Supreme Court focused on the fact that none of the plaintiffs had actually been defendants in proceedings before the defendants and had never suffered any of the constitutional violations alleged. Id. at 495-96. Even if the plaintiffs had suffered such consequences, the Court held, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." Id. The Court nonetheless recognized that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." Id. The Court highlighted that there were no allegations that any criminal statute at iaasue was unconstitutional on its face or as applied. Id. at 497. Instead, plaintiffs' case was premised on the possibility that they would violate some unidentified law, be charged, be held to answer, and be brought

before one of the defendants. Id. "[W]e doubt that there is sufficient immediacy and reality to [plaintiffs'] allegations of future injury to warrant invocation of the jurisdiction of the District Court." Id. (internal citations and quotations omitted).

In Rizzo v. Goode, the District Court for the Eastern District of Pennsylvania entered an order for a program intended to improve the handling of citizen complaints of police misconduct. 423 U.S. 362. The equitable relief ordered by the district court was upheld by the Third Circuit Court of Appeals, but vacated by the Supreme Court on a finding that the case lacked the requisite Article III case or controversy. Id. at 371-72. This was because the plaintiffs were not alleging any of the named defendants would violate their rights, but instead that a small set of police officers, not parties to the action, might violate plaintiffs' rights in the future based on their perception of departmental disciplinary procedures. Id. at 371-72. "This hypothesis is even more attenuated than those allegations of future injury found insufficient in O'Shea . . ." Id. at 372.

Lastly, in Ashcroft v. Mattis, a man was killed by police while attempting to escape, and his father brought a civil rights action. 431 U.S. 171. He sought damages and declaratory relief, but the district court denied both on a finding that the defense of good faith had been established. Id. Plaintiff appealed only the denial of declaratory relief, and the Eighth Circuit Court of Appeals reversed. Id. at 171-72. The Supreme Court disagreed, finding that the case did not present a live case or controversy. It concluded that Plaintiff had no possible damages claim and the request for declaratory relief would require the district court to answer a hypothetical question as to whether defendants would have been liable apart from their defense of good faith. Id. at 172.

In the instant case, the First Amended Complaint identifies Plaintiff as a transgender inmate who outwardly projects feminine characteristics. FAC ¶ 1. It discusses a heightened risk of assault on transgender inmates, particularly by their cellmates. See id. ¶¶ 19-20 n.4-5. It cites, for example, an April 2009 report by the University of California, Irvine Center for Evidence-Based Corrections, Transgender Inmates in California's Prisons: An Empirical Study of a Vulnerable Population, reporting

that in a sample of 2007 inmates, the prevalence of sexual assault amongst the male population of inmates surveyed was 4.4 percent whereas the prevalence of sexual assault amongst the transgender inmates surveyed was 59 percent. See FAC ¶ 19 n.4. The same report also noted that the majority of these assaults were likely to occur in personal spaces (e.g., dorms or cells). Id. ¶ 20 n.5.

Plaintiff claims that correctional staff and inmates at each of the facilities where she has been housed have observed or known of her gender identity. As a result, Plaintiff has been subjected to harassment and unwanted sexual advances several times at a number of different institutions, including at SCC; CSATF; California State Prison, Corcoran ("CSP-Cor") in Corcoran, California; the Deuel Vocational Institution ("DVI") in Tracy, California; and Mule Creek State Prison ("MCSP") in Ione, California.

The pleading highlights the many times that Plaintiff has been transferred and her classification status changed. Between 2009 and 2012, Plaintiff was granted single-cell status at MCSP by psychologists after they learned of sexual assaults occurring against her at Salinas Valley State Prison and Folsom State Prison in 1999. When Plaintiff was later transferred to Pelican Bay State Prison in 2012, a classification committee removed her single cell status. Plaintiff was then transferred back to MCSP in 2014, where a classification committee classified her as a double-cell inmate but placed her in a single cell in the Administrative Segregation Unit. Plaintiff was then transferred to SCC in the summer of 2014 where she was initially placed in a single cell but harassed by an inmate who repeatedly asked correctional guards to move her into his cell. In August 2014, a classification committee again classified Plaintiff as a double-cell inmate. Shortly after that hearing, but before she was moved to a double cell, Plaintiff was severely beaten by the inmate who wanted Plaintiff to agree to move in with him and have a sexual relationship with him. Plaintiff was then placed in Ad-Seg for her protection. Shortly after the SCC incident, Plaintiff was briefly transferred to CSP-Cor before being transferred to DVI in December 2015. There, the DVI classification committee classified Plaintiff as a double-cell inmate. Soon after she was placed with a cellmate, this inmate began making

sexual advances and at one point woke Plaintiff up from her sleep and attempted to force her to perform oral sex on him. Following this assault, DVI staff wanted to re-house Plaintiff with another inmate, but Plaintiff reported suicidal ideation in order to be single-celled. In May 2016, Plaintiff was transferred to CSATF where she again was double-celled. In June 2016, and within the span of one month, Plaintiff was sexually assaulted and raped by two different cellmates. She was then transferred to SCC in response to the latter incident and has been given a temporary single-cell status.

According to the pleading, Plaintiff has suffered multiple sexual assaults because she is a transgender inmate. These were perpetrated in multiple institutions by several cellmates or inmates who wanted her as a cellmate for sexual purposes. Plaintiff also has shown that her single-cell status designation is subject to revocation without regard to the history of violence against her and that a double-cell status carries with it a significant risk of harm.

Unlike O'Shea, then, the treat of future harm to Plaintiff is not premised on the possibility that she may engage in some misconduct which may bring her before one of the Defendants who might then proceed against her in an unconstitutional manner. The action Plaintiff here seeks to enjoin is no way similarly speculative. It is based upon the fact that she is a transgender inmate, that as such she faces a substantially heightened risk of assault, that that risk increases if she is celled with others, and that, as history has shown, she faces a risk that her single-cell status will again be revoked in the future. The risk of loss of single-cell status and the link between being double-celled and her rights being violated is not remote or "attenuated." According to the facts alleged, those risks have been shown to be quite real.

In Rizzo, the Supreme Court held that the broad injunctive relief at issue there was based not on the conduct of any of the named defendants, but instead on a small group of officers not parties to the action. Here, Plaintiff alleges that she has been subjected to legitimate concerns of non-speculative future harm based on the Moving Defendants' decisions. In additions, she seeks relief specific to her.

And unlike Ashcroft, the case before the Court does not present a remote hypothetical, but rather a plea by Plaintiff to be protected from ongoing action/inaction which has exposed, and will continue to expose, her to real harm, the likelihood of which will be increased if the relief sought is denied.

Defendants' Reply argues in effect that the probability of future double celling and harm is belied by the fact Plaintiff has had past periods of incarceration when she was not assaulted and when she was allowed single-cell status. But Plaintiff does not claim she will never be given single cell status or that she will be assaulted every time she is denied that status. She has, however, shown that she suffered four assaults between August 2014 and June 2017, all related to her housing assignment and status as a transgender inmate. Four successive assaults by four different individuals should cause any reasonable person to conclude that the risk of repeat such assaults in the future is quite real. The fact that Plaintiff might not have been assaulted by every single cellmate or at every single institution does not diminish the legitimacy of apprehension of future such assault when double-celled again. Plaintiff's history tips the scale from the simply possible to the entirely plausible, perhaps even highly likely, and justifies rational fear of "sufficient immediacy and reality".

The Moving Defendants argue too that "there is no indication whatsoever that any such future housing decisions would be made by any of the named Defendants." Defs.' Mem. of P. & A. Supp. of Mot. Summ. J. at 5. These Defendants, however, were able by administrative action to place Plaintiff in a temporary single cell, i.e., determine her cell placement. This suggests, for purposes of the present motion, that they are able to order future administrative actions involving cell designation. All that is required of Plaintiff in this action for injunctive relief is that she name an official who could appropriately respond to a court order on injunctive relief if one is issued. Harrington v. Grayson, 764 F. Supp. 464, 475-77 (E.D. Mich. 1991). She has done so. The actual capability of the individual Defendants to do that is a question of fact not suitable for resolution here.

The Moving Defendants' motion to dismiss for lack of subject matter jurisdiction should therefore be denied.

### B. Failure to State a Claim

As noted, the Moving Defendants also move for dismissal for failure to state a claim. They argue that their decision to transfer Plaintiff to SCC on temporary single-cell status is consistent with their duty to take reasonable steps to protect her from physical abuse and thus the antithesis of deliberate indifference. The Moving Defendants also argue that there is no constitutional protection for housing preferences.

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Helling v. McKinney, 509 U.S. 25, 31 (1993). Prison officials have a duty "to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners." Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing Farmer, 511 U.S. at 832–33; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005)).

To establish a violation of this duty, the prisoner must "show that the officials acted with deliberate indifference to threat of serious harm or injury to an inmate." Labatad, 714 F.3d at 1160 (citing Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002). This involves both objective and subjective components.

First, the alleged deprivation must be "sufficiently serious" and, where a failure to prevent harm is alleged, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw the inference." Farmer, 511 U.S. at 837. Liability may follow only if a prison official "knows that inmates face a substantial risk of

serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. When extrapolated from circumstantial evidence, the substantial risk of serious harm must be so blatantly obvious that Defendants had to have been aware of it. Foster v. Runnels, 554 F.3d 807, 814 (1970); see also Conn v. City of Reno, 591 F.3d 1081, 1097 (9th Cir. 2010) (holding that the magnitude of the risk must be "so obvious that [the defendant] must have been subjectively aware of it"), vacated, 563 U.S. 915 (2011), reinstated in relevant part, 658 F.3d 897 (9th Cir. 2011).

The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health...." Farmer, 511 U.S. at 843 (citing Helling, 509 U.S. at 35). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." Id. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." Id. at 836-37.

### 1. Individual Capacity Claim

The Court begins by considering Plaintiff's claim against CSATF Warden Sherman, who is the only Moving Defendant to be sued in his individual capacity. Plaintiff claims the Warden failed to protect her at two points: (a) following Plaintiff's May 3, 2016, transfer to CSATF and (b) following the June 7, 2016, sexual assault by Plaintiff's cellmate.

Plaintiff accuses Warden Sherman, first, of failing to take adequate steps to single cell her when she arrived at CSATF in May 2016 even though her Central File documented several incidents of assault in a shared cell attributed to her transgender status. This failure allegedly resulted in Plaintiff being sexually assaulted by her cellmate on June 7, 2016.

As pled, Plaintiff has not included sufficient facts to impose liability on this Defendant. The First Amended Complaint alleges that "Defendant Sherman was

responsible for overseeing the overall operation of the facilities, the correctional officers, and incoming and outgoing inmate transfers," FAC ¶ 38. There is no factual allegation that Warden Sherman personally reviewed Plaintiff's Central File on her transfer to CSATF or that he was involved in the decision to double-cell her so as to suggest actual knowledge of risk to Plaintiff. See Farmer, 511 U.S. at 842-43. To the contrary, institutional regulations delegate initial housing assignments and their annual reviews to staff members other than the warden. Compare Cal. Code Reg., tit. 15 § 3376(c)(1)-(2) (composition of Initial and Unit Classification Committees, which review an inmate's case upon transfer and at least annually thereafter) with § 3376(c)(2) (composition of Institution Classification Committees, which, inter alia, recommend transfer of inmates and act on cases referred by lower committees). Without allegations specifically linking the warden to such tasks, the Court will not impute knowledge to him based solely on his supervisorial position.

As to events after the June 7, 2016, incident, Plaintiff claims that she described that sexual assault in detail and showed her injuries to Defendant Lunes, who then reported the incident to Warden Sherman. FAC ¶¶ 44-54. Plaintiff also alleges that Warden Sherman, "[a]s Warden of her then-current facility," knew that Plaintiff had been assaulted at DVI prior to her transfer to CSATF because he received a carbon copy of the grievance filed by Plaintiff about the incident at DVI. See id. ¶ 54. Plaintiff's attorney also communicated with unidentified CSATF officials, once by telephone on June 27, 2016, and in written letters about Plaintiff's need for single-cell housing. Id. ¶¶ 60-61. Purportedly in response to the attorney's letters, Warden Sherman directed Defendant Lunes to conduct an interview. Id. ¶ 61. At this interview, Plaintiff informed Defendant Lunes that her new cell-mate was making sexual advances at her. Id. The cell-mate raped Plaintiff a couple of days later.

Such allegations, though concerning, still fall short of providing a factual basis for claiming that Warden Sherman was aware of, and failed to respond appropriately to, a substantial risk of serious harm to Plaintiff. No facts are alleged to support Plaintiff's

assumption that the Warden personally reviewed a copy of Plaintiff's grievance. Plaintiff does specifically allege that Defendant Lunes told Warden Sherman about the June 7, 2016, assault, but also says that Defendant Lunes's report described the incident as a "standard battery", not a sexual assault against a vulnerable transgender inmate." FAC ¶ 48. Lastly, assuming Warden Sherman was made aware of Plaintiff's need for single-cell housing through Plaintiff's attorney's letters, the Warden affirmatively reacted by directing correctional staff to interview Plaintiff. While perhaps more could or even should have been done, such action is inconsistent with deliberate indifference.

The Court therefore agrees that Plaintiff has failed to establish a basis for a deliberate indifference claim against Warden Sherman in his individual capacity. This claim therefore should be dismissed.

### 2. Official Capacity Claims

The remaining Moving Defendants—SCC Warden Martinez; CSATF Institution Classification Committee members Cartagena, Charkow-Ross, and Peterson; and SCC Unit Classification Committee members Wetenkamp and Loyd—are named in their official capacities only and are accused of disregarding a substantial risk of serious harm by not assigning Plaintiff permanent single-cell status following her transfer to SCC.

#### a. Policy or Custom

An official capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quotation marks and citation omitted). Federal courts have the power to enjoin a state official acting in his official capacity from acting in violation of federal law. Ex parte Young, 209 U.S. 123, 162-63 (1908).

"[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation ...; thus, in an official-capacity suit [,] the entity's 'policy or custom' must have played a part in the

violation of federal law." Graham, 473 U.S. at 166 (quotation marks and citation omitted) (emphasis added); Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law.") (quotation marks and citation omitted).

Plaintiff here does not allege that there is an official policy to violate the rights of transgender inmates. To the contrary, she alleges that CDCR fails to comply with an established policy to protect, i.e., requirements of the Prison Rape Elimination Act ("PREA") incorporated into CDCR's Operations Manual. FAC ¶¶ 80-90; see also Cal. Code Regs., tit. 15 § 3269(d)(2) (recommending single-cell status for inmates who have "[d]ocumented and verified instances of being a victim of in-cell physical or sexual abuse by another inmate.") Specifically, Plaintiff claims that there is a CDCR custom of returning vulnerable transgender inmates to double-cell housing assignments and/or of "passing the buck" by simply transferring such inmates following threats or assaults. To support a viable such claim, Plaintiff must show "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.1996).

As noted, Plaintiff cites several instances from 1999 to the present where she was assaulted and her housing assignment changed from double-cell to single-cell and vice versa: She was the victim of unspecified sexual assaults in 1999 at Salinas Valley State Prison and Folsom State Prison. No further such events occur until 2009. In that year she was single-celled at MCSP because of the 1999 assaults. She then (a) was double-celled at Pelican Bay State Prison in 2012; (b) had an unspecified housing assignment at R.J. Donovan Correctional Facility in or around December 2013; (c) was classified as double-celled at MCSP in 2014 but actually was single celled in Ad Seg; (d) was initially placed in single-cell at SCC on transfer there in 2014, changed to double-cell status in August 2014, and then moved to Ad-Seg after being assaulted by an inmate who wanted to room with her and have a sexual relationship; (e) had an unspecified housing

assignment at CSP-Cor following a September 2014 transfer; (f) was double-celled at DVI following a December 2015 transfer, and sexually assaulted by her cellmate in March 2016; (g) was double-celled at CSATF following a May 2016 transfer and assaulted by one cellmate on June 7, 2016, and by another on June 29, 2016; and (h) was single-celled at SCC following her July 2016 transfer.

There are no allegations involving Plaintiff's housing assignment between 1999 and 2014. The identified incidents of assault begin in August 2014, when Plaintiff was assigned to double-cell at SCC. She was not double-celled there, but moved to Ad-Seg after assault by the inmate who wanted to double-cell with, and have a sexual relationship, with Plaintiff. Thereafter, Plaintiff was assaulted three times by actual cellmates: the first on March 18, 2016 at DVI; the second on June 7, 2016, at CSATF; and the third on June 29, 2017, also at CSATF. After the first cellmate assault, DVI officials sought to double-cell Plaintiff with another inmate, but her claim of suicidal ideation got her placed in Ad-Seg. Plaintiff was then immediately transferred to CSATF where she was double-celled and assaulted yet again. Following the second assault, Plaintiff was double-celled with another inmate who raped her. Following the third assault, Plaintiff was transferred and single-celled pending an investigation into the third assault.

Thus Plaintiff suffered four assaults related to her housing assignment and status as a transgender inmate between August 2014 and June 2017. Per Plaintiff, CDCR officials repeatedly tried to double-cell her or transfer her after assaults. The undersigned finds the responses to be of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918. While "[l]iability for improper custom may not be predicated on isolated or sporadic incidents," see id., Plaintiff has sufficiently alleged the existence of a CDCR custom and thereby overcome dismissal.

### b. Failure to Protect

Defendants next argue that their decision to transfer and house Plaintiff at SCC with a temporary single-cell housing assignment does not place her at risk of serious harm. She does not allege that her current housing situation is dangerous. They also argue the absence of any allegations that Defendants were aware of facts from which Defendants could have inferred a substantial risk of harm in transferring Plaintiff to SCC on temporary single-cell status.

These arguments miss a critical point already discussed: the history of Plaintiff's multiple transfers and changing housing assignments leaves her at risk of losing her current temporary single-cell status. This is not a hypothetical concern; it is premised on an institutional history where, over the course of 17 years, Plaintiff has been transferred at least 10 times and her housing assignment changed at least 8 times. Indeed, institutional regulations require that housing determinations be made anew upon transfer and be reviewed at least annually. See Cal. Code Regs., tit. 15 § 3269(a) ("Upon arrival at an institution, facility, or program reception center, a designated custody supervisor shall screen an inmate for an appropriate housing assignment."); § 3376(d)(2)(A) (the Unit Classification Committee must "[r]eview each inmate's case at least annually…").

Plaintiff alleges that the changes to her housing assignment and the history of threats and assaults against her are reflected in her Central File and that Classification Committee Defendants (CSATF Institution Classification Committee members Cartagena, Charkow-Ross, and Peterson, and SCC Unit Classification Committee members Wetenkamp and Loyd) had to have reviewed that file in determining her housing assignment upon her transfer or during her housing assignment review. See Cal. Code Regs., tit. 15 § 3269(a) (housing determinations shall be made following a review of, inter alia, previous housing status, reason(s) for prior segregation, history of in-cell assaults and/or violence, documentation that the inmate has been the victim of a sexual assault or was previously single celled); § 3269(d) (housing determinations for

17

single-cell status shall consider "[d]ocumented and verified instances of being a victim of in-cell physical or sexual abuse by another inmate").

Despite knowledge, so derived, of the risks to Plaintiff from being a double-celled transgender inmate whose housing assignment likely would change, Defendants assigned her to temporary, instead of permanent, single-cell status. Doing so exposed her, and continues to expose her, to loss of that temporary status and thus to repetition of the consequences of a shared cell. Thus, the Court finds, is sufficient to tate a claim against these Classification Committee Defendants for failure to adequately protect Plaintiff.

For the same reasons as set forth above as to CSATF Warden Sherman, the allegations fall short of asserting a cognizable claim against SCC Warden Martinez . Plaintiff assumes Warden Martinez, by virtue of his position, was aware of Plaintiff's institutional history and the threat of future harm to her. The pleading, though, alleges only that Warden Martinez was aware of the then-recent sexual assaults at CSATF preceding her transfer to SCC. See FAC ¶ 67. Plaintiff's claim that Warden Martinez was aware of Plaintiff's institutional history is too conclusory, too speculative to state a claim.

### 3. Housing Preference

The Court now turns to the Moving Defendants' final argument that there is no cognizable constitutional violation in denying an inmate a housing preference. In support, they rely on Maldonado v. Yates, Case No. 1:11-cv-2164 AWI JLT, 2013 WL 819802, at *5 (E.D. Cal. Mar. 5, 2013), a case in which plaintiff filed a failure to protect claim for being housed with an African-American cellmate. His action was premised upon his objection to the cellmate's skin color, not any threat of harm. The court dismissed this claim as follows:

> There are no facts alleged that the inmate threatened Plaintiff or that any incident occurred which justified Plaintiff's fear. The fact that Plaintiff preferred housing with a different inmate, one of a different race or one of a different age, does not state a constitutional violation when prison officials failed to accommodate this preference. Moreover, there are no

>facts alleged that any Defendant was aware of any objective risk of harm.

Id. at *5. Here, in contrast, Plaintiff is not seeking a housing assignment based on subjective preferences, but rather based upon a history which reflects a reasonable fear of future sexual assault, as discussed supra. Maldonado is not on point.

**IV.    Leave to Amend**

To the extent the Moving Defendants' motion is granted in whole or in part, Plaintiff has requested leave to amend. Pursuant to Rule 15 of the Federal Rules of Civil Procedure, a party may amend its pleading after the opposing party has served a responsive pleading "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Upon motion to the court, "[t]he court should freely give leave when justice so requires." Id. "This policy is 'to be applied with extreme liberality.'" Eminence Capital. LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)).

The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court, which may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). In assessing these factors, the consideration of prejudice should carry the greatest weight. Eminence Capital, 316 F.3d at 1052.

In light of this liberal standard and in the absence of any mitigating factors, the undersigned will recommend that Plaintiff be granted leave to amend her pleading.

**V.    Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that the Moving Defendants' Motion to Dismiss (ECF No. 41) be GRANTED IN PART.

1. Plaintiff's Eighth Amendment failure to protect claim against CSATF Warden Sherman and SCC Warden Martinez be dismissed for failure to state a claim. The motion be denied in all other respects; and

2. Plaintiff be granted leave to amend.

The findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with the findings and recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." A party may respond to another party's objections by filing a response within fourteen (14) days after being served with a copy of that party's objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: December 9, 2017        /s/ *Michael J. Seng*
                               UNITED STATES MAGISTRATE JUDGE